**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**SAMANTHA CONNER**                                    **PLAINTIFF**

**vs.**                                    **CIVIL ACTION NO. 3:20-CV-057-MPM-RP**

**ALLTIN, LLC, JAMES E. BROOKS, KEVIN CASTEEL,
WILLIE A. "SONNY" SANDERS, IN HIS OFFICIAL
CAPACITY AS THE DULY ELECTED CONSTABLE OF
LOWNDES COUNTY, AND WILLIE A. "SONNY"
SANDERS IN HIS INDIVIDUAL CAPACITY**                  **DEFENDANTS**

**ORDER**

This court presently has before it motions filed by plaintiff Samantha Conner to declare

certain Mississippi eviction statutes unconstitutional, and it also has before it various motions for

summary judgment filed by the parties. Having considered the memoranda and submissions of

the parties, this court concludes that the Mississippi statutes in question are, in fact,

unconstitutional and must be so declared. Recognizing that this case presents a number of

difficult constitutional issues, however, this court will certify these issues for interlocutory

appeal before the Fifth Circuit and stay its ruling today pending resolution of that appeal.[1]

This case presents important and novel issues regarding the question of how far a state

may constitutionally go in granting landlords the right to seize and keep the property of their

---

[1] This court had previously indicated that it would wait until the Legislature began its regular
session in January before releasing its ruling on the constitutionality of Mississippi's eviction
statutes. This court's decision to release its order now is based upon its conclusions that 1) the
stay of its ruling pending appeal will allow evictions to go forward under current law, where
necessary and 2) even assuming that this court's order today has a chilling effect on evictions in
this state pending the Legislature's 2022 session, it would not regard any slowdown in evictions
during the holiday season as a negative development.

tenants during evictions.[2]  In its briefing in this case, the Mississippi Attorney General ("the AG") acknowledges that, in enacting certain eviction statutes, the Mississippi Legislature has gone further than any other state in this nation in allowing landlords to essentially assert full ownership over property of the tenant which is found on the leased premises at the time of eviction.  *See* Miss. Code Ann. §§ 89-7-31, 89-7-35 and 89-7-41.  Moreover, while Mississippi law, like that of other states, generally exempts a wide range of property of a debtor from attachment by a creditor,[3] Mississippi's eviction statutes effectively create an exception to this rule for tenants who overstay their lease.  Thus, Mississippi tenants who overstay their lease may be confronted with the loss of virtually everything they own, even cherished belongings such as family photos and diplomas which have no discernable economic value to the lessor.

The facts surrounding the eviction in this case provide a good illustration of the real-life consequences of singling out overstaying tenants as a uniquely disfavored class of debtors under Mississippi law.  Although, as discussed in greater detail below, the Justice Court failed to issue a statutorily-required Notice of Possession in this case directing plaintiff to leave by a specific date, it did issue, on February 19, 2019, a Warrant of Removal directing the "Sheriff or any constable" to remove plaintiff from her premises.  While there is some confusion in this record whether this removal was carried out on February 20 or February 21, it is undisputed that, at the time Constable Willie Sanders, accompanied by landlord Kevin Casteel, showed up at the

---

[2] This court has previously entered multiple orders on various motions filed in this case, and it will therefore not provide a full recounting of the procedural history of this case here.  The reader is directed to docket entries 77-1, 141-1 and 146-1 to obtain a fuller understanding of the procedural events in this case.
[3] *See, e.g.* Miss. Code Ann. § 85-3-1, "Property exempt from seizure under execution or attachment."

apartment, plaintiff was on the premises and expressed a willingness to leave, while taking her

belongings with her.

In her briefing in this case, plaintiff describes how her offer to leave with her belongings

was refused, writing that:

> While Samantha prepared to leave, Casteel changed the locks on the apartment and began
> taking a visual inventory of Samantha's belongings that he now claimed were his. When
> Samantha prepared to leave, Casteel and Sanders followed her through the apartment like
> she was a criminal trying to steal her own property. On her way out, Samantha tried to
> take her computer. Casteel snatched it out of her hands, saying "No, you can't take that"
> and to Constable Sanders, "I told you she was crazy. Lock her up." Samantha then tried
> to take her hard drive, which she needed for her work as a paralegal. Casteel again
> ordered Constable Sanders to stop Samantha from removing her hard drive screaming,
> "Make her give it back. Make her give it back. She can't keep it. Tell her she can't keep
> that. Arrest her. Arrest her." Constable Sanders followed Casteel's instructions and
> physically blocked Samantha from leaving until she handed her hard drive to him.
> Constable Sanders then gave the hard drive to Casteel. Casteel even objected to Samantha
> taking a tub of Vaseline. Defeated, Samantha left her home and all of her belongings in
> order to avoid being arrested.

[Plaintiff's brief at 6]. As discussed below, defendants' actions were encouraged by Mississippi

eviction statutes which engage in the legal fiction that a plaintiff who fails to timely vacate her

apartment, as required by an eviction order, has irrevocably "abandoned" her property in it, even

if she is on the premises at the time of eviction and makes it clear that she is prepared to leave,

but wishes to do so with her property.

This court notes that other states have discovered a much more sensible way of dealing

with the common factual situation presented by this case. West Virginia statutes, for example,

provide that, in order for the personal property of an overstaying tenant to be deemed

"abandoned," she must have "informed the landlord in writing" that such is the case, or else it

must be "garbage." W. Va. Code Ann. § 55-3A-3(h). The West Virginia statute further provides

that any property seized by the landlord must be removed and stored, at the tenant's expense, and

that the landlord may only "dispose" of such property after thirty days, if "[t]he tenant has not

paid the reasonable costs of storage and removal to the landlord and has not taken possession of the stored personal property." § 55-3A-3(h)(2).

Mississippi's eviction statutes fail to engage in such a reasonable balancing of the interests of the landlord and tenant, instead giving the landlord full and complete authority to immediately "dispose of" any personal property of the tenant, with unpredictable and absurd results. For example, a plaintiff who had managed to put on two shirts at the time of eviction would presumably be able to take them with her, while the same shirts would be deemed irrevocably abandoned if left hanging in her closet. This is, once again, the case even if the plaintiff made it abundantly clear that she was not abandoning her property and wished to take it with her. Moreover, a tenant fortunate enough to be evicted by a landlord with a modicum of human decency might be allowed to take much of her property with her, while less fortunate tenants, such as the plaintiff in this case, might see cherished personal possessions such as family photos and diplomas maliciously discarded.

As jarring as the eviction process in this case may be, the plaintiff was repeatedly told during her eviction that it was being carried out in accordance with Mississippi law. Indeed, this was stated quite clearly to plaintiff when she called the Justice Court during the eviction to find out whether defendants actually had a right to prevent her from removing her personal property from the apartment. This fact is established by the defendants, who note in their brief that plaintiff obtained confirmation from the Justice Court that defendants did, in fact, have the right to seize her belongings, writing that:

> When Constable Sanders announced himself to Plaintiff and informed her that he was there to remove her from the apartment pursuant to a warrant of removal, Plaintiff took the warrant from him, reviewed it, and called justice court to confirm Constable Sanders had the authority to evict her and require her to leave all of her belongings. She testified, "I was basically trying to find out, like is this right, like can he make me leave without taking any of my belongings. And she basically like told me that it was, that they could.

4

[Defendants' reply brief at 4, quoting plaintiff's deposition at 51].

Constable Sanders, in his capacity as the state's representative during the eviction, provided plaintiff with further confirmation that all of her former property now effectively belonged to her landlord Casteel. Indeed, in recounting his memories of Samantha's eviction, Sanders testified that:

> "[S]he said she don't know why she got to move and this and that. And I said, 'Well ma'am, you got to leave.' So I said, 'now, you can get you some – you can get your eyeglasses or your – your medicine or you can get a few clothing and gets your kids some clothing, but you got to move. You can't carry anything else with you.' And that was it. She left out, and we locked the door, and that's it."

Exhibit B (Sanders Deposition, p. 52, ln. 22 – p. 53, ln. 5). This court notes parenthetically that, as far as it is aware, nothing in the Mississippi eviction statutes required Sanders to allow plaintiff to take her medicine and eyeglasses with her, and his decision to allow plaintiff to do so appears to have been an act of mercy on his part. This court further notes that the briefing in this case provides additional confirmation that the seizure of plaintiff's property was carried out pursuant to state law, since, as discussed below, the AG makes no effort to argue that Casteel exceeded his statutory authority by essentially treating her property as his own.

In his interrogatory responses, Casteel indicated that he eventually sold, donated, or threw away all of plaintiff's possessions, without returning any of it to her. Exhibit D (Casteel Discovery Responses, Response, 3). Specifically, Casteel asserted that:

> On or about March 8, 2019, we delivered to the Palmer Home a number of contractor bags full of clothes, houseware, and other items from the apartment complex and donated same to the Palmer House. On March 1, 2019, the PlayStation was sold for $100.00 to a tenant, whose name was Paul, the last name I do not recall. On March 4, 2019 electronic equipment, consisting of a small television, was sold for $40.00 to someone, I do not remember whom. On March 8, 2019, certain kitchen items were sold for $50.00. Again, I do not recall to whom. On March 8, 2019, two (2) lady's gold rings were sold for $80.00 to Possum Town Pawn Shop in East Columbus. On April 11, 2019, a washer and dryer was sold for $50.00. However, I do not recall to whom. I specifically recall donating

> Plaintiff's bed, dresser, and an incomplete dinette set, all in poor condition, to a tenant who had no furniture at all. To that same tenant, we also gave a projection television. The son's bedroom suite and other items were not salvageable and placed in a dumpster, as was the balance of the personal property that had absolutely no value.

Exhibit D (Casteel Discovery Responses, Response 3).

Casteel thus indicated, almost as an afterthought, that "[t]he son's bedroom suite and other items were not salvageable and placed in a dumpster, as was the balance of the personal property that had absolutely no value." *Id.* In the court's view, it is important to note exactly what this property was which Casteel described as having "absolutely no value." In her brief, plaintiff describes this property as including her "keepsakes from when her son was a baby, her personal records and items, and family photographs, among other things." [Plaintiff's brief at 9]. In the court's view, it can only be regarded as an act of pure mean-spiritedness and spite that Casteel deemed it preferable to throw plaintiff's cherished personal items in a dumpster rather than allow her to keep them or return them to her.

Significantly, the AG makes no effort in her briefing to argue that even this act of callousness and inhumanity by Casteel was inconsistent with Mississippi's eviction statutes. To the contrary, the AG (rather dryly) writes that:

> The statutes in question do not provide specific guidance to landlords regarding what they should do to "dispose of" a tenant's property not removed before the warrant of removal is executed. Although the phrase "dispose of" may not be defined, by common definition it means "to get rid of," "to deal with conclusively," or "to transfer to the control of another." [https://www.merriam-webster.com/dictionary/ dispose]. Applying any of these plain terms, it should be clear to the tenant that she risks losing her property if she fails to remove it by the date set by the judge.

[AG's brief at 15].

While this court recognizes that not every outrageous law is unconstitutional, it harbors no doubt whatsoever that the Mississippi statutes permitting evictions such as the one in this case are, in fact, outrageous. It should be noted, however, that the language of the relevant

6

Mississippi statutes does not expressly grant landlords the right to essentially assert ownership over an overstaying tenant's property. Rather, § 89-7-35(2) (for uncontroverted eviction proceedings) and § 89-7-41(2) (for contested evictions) provide in pertinent part that:

> If the summons complied with the requirements of Section 89-7-31(2) and if the tenant has failed to remove any of tenant's personal property, including any manufactured home, from the premises, then, if the judge has not made some other finding regarding the disposition of any personal property in the vacated premises, the personal property shall be deemed abandoned and may be disposed of by the landlord without further notice or obligation to the tenant.

The relevant statutes thus provide that the tenant's property which is left on the leased premises at the time of eviction "may be disposed of by the landlord without further notice or obligation to the tenant." *Id.* In their briefing, defendants note that a third statute, Miss. Code Ann. § 89-7-31(2), utilizes similar language in describing the notice which is required to be provided to the tenant prior to eviction. Specifically, this statute requires that the summons provided to a tenant prior to eviction inform her that:

> (2) In addition to other information required for the summons, the summons shall state: "At the hearing, a judge will determine if the landlord is granted exclusive possession of the premises. If the judge grants possession of the premises to the landlord and you do not remove your personal property, including any manufactured home, from the premises before the date and time ordered by the judge, then the landlord may dispose of your personal property without any further legal action."

Miss. Code Ann. § 89-7-31(2).

In the court's view, the key words in these statutes are "may be disposed of by the landlord." The AG appears to concede in its briefing that this is very vague terminology, and, in the court's view, a tenant being confronted with these words in a summons would reasonably harbor confusion regarding exactly what they meant. As discussed below, this confusion, which inevitably springs from the language of the above-cited statutes, forms the starting point for this

court's concerns regarding their constitutionality. Confiscatory statutes should be plainly understood by common folks.

Before making specific findings regarding the constitutionality of the relevant Mississippi statutes, however, this court must first address the question of whether it should address this issue at all. In its briefing, the AG asks that this court decline to address the constitutionality of the Mississippi statutes at issue, on the basis that the Justice Court failed to correctly follow the statutorily-required procedures for eviction. Indeed, it is revealing that the AG devotes such a large portion of her brief to urging that this court not address the constitutional issues in this case, and the AG's constitutional arguments, when stated, are very vague and non-specific. This court has considerable sympathy for the AG's position in being legally required to defend these statutes and is not surprised that she would prefer that this court not address these issues.

In urging that this court not consider the constitutional issues, the AG emphasizes that, at the pre-eviction hearing, the Justice Court judge incorrectly failed to issue the Judgment of Possession required by Miss. Code Ann. § 89-7-41(1), which would have granted the landlord possession of the premises. [AG's brief at 7-8]. While the AG appears to be correct that the Justice Court judge improperly failed to issue a Judgment of Possession, it is apparent that any such judicial error was not the sole cause of the harm suffered by plaintiff in this case and that constitutional infirmities in Mississippi's eviction statutes played a very significant role as well. In so stating, this court notes that the AG writes in her brief that:

> The summons issued to Conner did contain the requisite statutory language, and Constable Sanders followed proper statutory procedure when he served the summons by pinning it to her apartment door on January 27, 2019. As a result, Conner was put on notice through the summons that 1) the justice court would determine whether Alltin was entitled to possession, and 2) Alltin might, in the event of an eviction, dispose of her property if she failed to remove it from the apartment by the date ordered by the justice court.

8

[Brief at 5, citing Ex. C, Summons to Tenant].

The AG thus notes that the statutorily-required summons was correctly placed on plaintiff's door, and she maintains that the language of that summons, in particular its reference to the "dispos[al]" of her property in the event of eviction, properly put plaintiff on notice of what might happen to her property in the event of eviction. As discussed below, this court disagrees with the AG on this point and concludes that the statutory language played an important role in shaping the actions of all the defendants in this case, and it further seems likely that knowledge of the nature of this statutory language led to the affirmative response given by the Justice Court to plaintiff when she called to inquire whether she was forced to forfeit her personal property. In so stating, this court notes that landlords and justice courts routinely apply the Mississippi statutes at issue in this case during evictions, and this experience has, no doubt, shaped their views on what lessors may, and may not, lawfully do during evictions.

In light of the foregoing, while there does appear to have been a mistake made by the Justice Court in following some of the specific eviction procedures in this case, this court regards this as insufficient reason to ignore the constitutional infirmities in Mississippi statutes which, it seems clear, were a major contributing factor in the injuries suffered by plaintiff in this case. This court will therefore address plaintiff's argument regarding the constitutionality of Mississippi's eviction statutes and concludes that §§ 89-7-31, 89-7-35 and 89-7-41 fail to pass constitutional muster on multiple grounds, as will presently be discussed.

**Sections 89-7-31, 89-7-35 and 89-7-41 of the Mississippi Code violate the Fourteen Amendment's Due Process Clause by failing to provide constitutionally adequate notice of the consequences of a tenant's failure to vacate the leased premises prior to eviction**

In the court's view, the first constitutionally-deficient aspect of §§ 89-7-31, 89-7-35 and 89-7-41 lies in the fact that, by simply warning tenants that their landlord will "dispose of" any of their property left on the premise at the time of eviction, these statutes fail to provide tenants with adequate notice that any and all personal property left on the premises at the time of eviction, including property ordinarily exempted from execution by creditors under Mississippi law, will, in effect, become the personal property of the landlord and that the tenant will have no legal ability whatsoever to compel the return of that property. These statutes further fail to inform the tenant that Mississippi law authorizes landlords to go far beyond what, this court believes, a typical tenant would regard as the most likely meaning of the phrase "dispose of" in this context, namely the removal of their property from the leased premises so that the landlord may rent the premises to someone else.

This court concludes that, by failing to make the consequences of eviction clear to tenants, Mississippi's eviction statutes violate the notice provisions which have long been an implicit guarantee of the Fourteenth Amendment's Due Process Clause. This Clause provides that "[n]o state shall … deprive any person of life, liberty, or property, without due process of law." There is no question that plaintiff was deprived of her property in this case, and in applying the Due Process Clause, the United States Supreme Court has stated, "[f]or more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Baldwin v. Hale*, 1 Wall. 223,233 (1863). The Supreme Court has further stated that "[d]ue process is afforded only by the kinds of 'notice' and 'hearing' that are aimed at establishing the validity, or at least the probable validity, of the underlying claim against the alleged debtor before he can be deprived of his property .... ". *Fuentes v. Shevin*, 407 U.S. 67, 97, 92 S.Ct.

1983, 32 L.Ed.2d 556 (1972).  In *Goldberg v. Kelly*, the U.S. Supreme Court similarly wrote that:

> 'The fundamental requisite of due process of law is the opportunity to be heard.' The hearing must be 'at a meaningful time and in a meaningful manner.' In the present context these principles require that a recipient have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally.

*Goldberg*, 397 U.S. 254, 267–68, 90 S. Ct. 1011, 1020 (1970).

In the court's view, an implicit, and crucial, requirement of due process is that, before a citizen can even decide whether or not to participate in the procedures which are provided, she must first know what is at stake, and what she stands to lose in the event that she loses the proceedings.  Moreover, while *Goldberg* was decided in the context of the termination of welfare benefits, its holding that due process requires "adequate" notice clearly applies in other contexts as well.  In the eviction context, it seems clear to this court that minimal due process requires that, in order to be considered "adequate," the notice provided to the tenant must inform her of the actual consequences of her failure to timely vacate the premises.  In her briefing, the AG does not appear to dispute this point, arguing instead that the statutory notice provided by the Mississippi legislature does, in fact, provide such adequate notice of what will happen to the tenant's property in the event of eviction.

As quoted previously, the AG emphasizes that the dictionary definitions of "to dispose of" are "to get rid of," "to deal with conclusively," or "to transfer to the control of another." [AG's brief at 15].  The AG further argues that "[a]pplying any of these plain terms, it should be clear to the tenant that she risks losing her property if she fails to remove it by the date set by the judge." *Id.*  In the court's view, however, even the AG's own interpretation of the term "dispose of" fails to include any definition which may fairly be equated with acquisition of full and

11

irrevocable ownership of the property by the landlord. This court regards this refined definition as significant, since it is hard to characterize the control exercised by the lessor defendants in this case, and that exercised by countless other Mississippi landlords during evictions, as anything other than an assertion of full ownership. Once again, the lessor defendants concede that, in disposing of plaintiff's property, "[v]arious items of value left in the apartment were sold to cover the judgment, and those without value were either donated or disposed of." In the court's view, it is difficult to discern who, other than an owner, would have had such broad power over the "disposal" of property as that exercised by defendants in this case. Indeed, the lessor defendants concede that much of plaintiff's property was sold and now has been converted into money in their bank accounts, over which they clearly have full ownership and have no intention of "disposing."

The acts of seizing and then selling a tenant's property and keeping the proceeds of the sale go far beyond what most tenants would regard as a mere "disposal" of the property. Moreover, while the Mississippi eviction statutes stop short, conceptually speaking, from providing full ownership of the property to the lessor, they effectively prevent the tenant from obtaining any recourse against the landlord for violating any theoretical rights she might have in her property. The statutes thereby create something of a "perfect storm" of ambiguity by giving landlords *effective* ownership of the tenant's property, while still failing to use terminology actually consistent with full ownership. Inevitably, both parties to the eviction will fill this void with their own preferred reading of the statute, in accordance with their own interests, with predictably contentious results. Rather than encouraging peace in the land, such statutes breed contempt for the laws and disillusionment with the judicial process.

12

This court also notes that a subtle, yet very important, difference in the language used by the three eviction statutes seems almost calculated to increase the ambiguity and uncertainty which exists in this context. As noted previously, § 89-7-35(2) and § 89-7-41(2) provide that the tenant's property which is left on the leased premises at the time of eviction "may be disposed of by the landlord without further notice or obligation to the tenant." These are the statutory provisions which, it appears to this court, are most likely to be read by landlords or Justice Court judges who regularly participate in the eviction process, but not by tenants with no particular expertise in this area. These provisions make it clear that, once the landlord "dispose[s] of the property," he shall have no "further … obligation to the tenant" under Mississippi law. These words strike this court as being equivalent to a guarantee of blanket immunity for the landlord, and seem calculated to make clear to him that he is free to carry out the "disposal" of the tenant's property in the manner he deems best, with no fear of liability. Once again, the AG does not appear to take issue with Casteel's interpretation of these statutes, which, he believed, allowed him to essentially treat plaintiff's property as his own and to even throw away her cherished personal possessions which had no economic value to him.

It is thus apparent that the substantive Mississippi eviction statutes include language which makes clear to the landlord that he can essentially do as he pleases with regard to an overstaying tenant's property, and, in light of this fact, this court concludes that considerations of due process require that any notification provided to the tenant must make this rather extraordinary fact clear to her. This court therefore regards it as very significant that the notice statute in question, Miss. Code Ann. § 89-7-31(2), inexplicably uses *different* language to inform the tenant of what will happen in the event of an eviction. To reiterate, this statute provides, in pertinent part, that:

13

> If the judge grants possession of the premises to the landlord and you do not remove your personal property, including any manufactured home, from the premises before the date and time ordered by the judge, then the landlord may dispose of your personal property without any further legal action.

*Id.*

Section 89-7-31(2) thus informs the tenant that, in the event of eviction, "the landlord may dispose of your personal property without any further legal action." *Id.* It would have been a simple matter for the Legislature to simply quote the "may be disposed of by the landlord without further notice or obligation to the tenant" language of § 89-7-35(2) and § 89-7-41(2) which forms the substantive Mississippi law in this context, and it is unclear to this court why it did not to so. Whatever the reason for the Legislature's actions, there is clearly a material difference in the language of the three statutes, since § 89-7-31(2)'s reference to "dispos[al] of your personal property without any further legal action" seems to indicate that the landlord need not go through additional legal procedures *before* disposing of the tenant's property. Sections 89-7-35(2) and 89-7-41(2), by contrast, indicate to the landlord that he can carry out the disposal in the manner he sees fit, with no reason to fear any further legal proceedings or liability *after* doing so. The statutory notice provided to the tenant thus does not inform her that the landlord may sell, keep for himself, or otherwise treat her property as his own, with what essentially amounts to legal impunity.

This court has reviewed the language of the summons which was left on plaintiff's door in this case, and, consistent with the requirements of § 89-7-31(2), it simply told her that, if she failed to timely remove her property before eviction, then it could be disposed of "without any further legal action." [Exhibit C]. This court believes that a reasonable tenant in plaintiff's position would have interpreted this language as a warning that, if she did not remove her property by the time of eviction, then the landlord might leave her belongings on a curb or, at the

14

very worst, put them in a dumpster, without first seeking court permission to do so. [4]  Even in the dumpster scenario, however, the plaintiff would know that she had the ability to retrieve her property from the receptacle, since nothing in the statutory warning, or in the common experience of Americans living in a country where debtors normally have some rights, would lead her to believe that overstaying a lease by one minute would irrevocably cost her the ability to assert rights in any and all of her property.

This court can discern no reason why a tenant in plaintiff's position would have even dreamed, based on the language of the summons, that she would be confronted with the Kafkaesque nightmare which actually transpired in this case.  Such things do not happen in America.  In forty-nine states in this country, this perception would be correct.  Indeed, the AG appears to tacitly concede that no other state has enacted as draconian an eviction scheme as Mississippi, writing that while "other states may not have a statutory eviction procedure like Mississippi's does not render them unconstitutional."  [A.G.'s brief at 16].  The AG's concession in this regard is in tacit response to a challenge previously issued to it by this court, in an October 2020 order, to point out "similar statutes in other states which have been held constitutional." [Slip op. at 3].  In issuing this challenge, this court noted that "a failure to demonstrate such authority would tend to strengthen its concerns regarding the legality of the Mississippi statutes in question," *id.* and this has, in fact, occurred.

---

[4] This court notes parenthetically that a tenant who was unusually well-informed regarding nationwide eviction practices, as well as Mississippi's exempt property laws, would have been particularly unlikely to interpret the "dispose of" language in the same manner as the AG does in her briefing.  Such a tenant would be aware that no other state grants a landlord effective ownership of a tenant's property during an eviction, and he or she would further be aware that, in other debtor-creditor contexts, Mississippi law expressly prevents a creditor from attaching the same sort of property which was seized and sold by defendants in this case.  *See, e.g.* Miss. Code Ann. § 85-3-1.

That brings this court to what it considers the clearest manner in which Mississippi's eviction statutes violate the notice requirements of the Due Process Clause, namely by failing to make clear that these statutes effectively abolish, for overstaying tenants, long-established statutory rights which Mississippi debtors have historically enjoyed to exempt a wide range of their personal property from attachment or execution by creditors. While this court certainly does not agree with the AG's understanding of the term "dispose of," it recognizes that, considered in a legal vacuum, it would at least have an argument that this language is sufficiently broad to encompass Casteel's actions in this case. The crucial point, however, is that, when defendants left the summons containing the statutorily-required "dispose of" language on plaintiff's door, they did not do so in a legal vacuum. Rather, the notice was provided in the context of Mississippi state law which has long made clear to debtors that they do not stand to lose all of their property, except the clothing they have on them, simply for having gotten behind in their bills.

For example, Mississippi's exempt property laws provide that "[t]here shall be exempt from seizure under execution or attachment" various classifications of property which were, for all intents and purposes, executed upon in this case, including "[t]angible personal property of the following kinds selected by the debtor, not exceeding Ten Thousand Dollars ($10,000.00) in cumulative value." These classifications of property exempted by statute include "[h]ousehold goods" and "[a]ny items of tangible personal property worth less than Two Hundred Dollars ($200.00) each." *See* Miss. Code Ann. § 85-3-1(a)(i) and (vii). These exemptions have been a part of Mississippi law for decades, and, while this court doubts that many citizens can cite their exact provisions, it believes that it is commonly understood that the property of Mississippi debtors is not completely at the mercy of their creditors. This is because there is a general belief

16

among the populace that it is in the best interests of all to allow even the poorest of our citizens to keep some of their clothing, bedding and other personal items. Moreover, while Mississippi's eviction statutes do not expressly override Mississippi's exempt property statutes, this is clearly the effect of laws which grant landlords unfettered discretion to "dispose of" a tenant's property and make clear that they may do so "without further notice or obligation to the tenant." This court doubts that any tenant with even a passing knowledge of Mississippi's exempt property laws would regard a vague notice left on her door warning that she risked having her property "disposed of" by her landlord during eviction amounted to a revocation of long-standing statutory rights to protect much of her property from creditors.

In light of the foregoing, this court regards the events in this case as evidencing more than a simple lack of notice; they strike it as being tantamount to a legal bait-and-switch which violates the most basic principles of due process. Under this statutory shell game, the Legislature on the one hand enacts § 85-3-1, which provides, with no stated exception for tenants, that "[t]here shall be exempt from seizure under execution or attachment" up to $10,000 in personal property, then, on the other hand, it enacts eviction statutes which specifically allow landlords to "dispose of" any and all property of the debtor left on the premises. Moreover, the statutory notice devised by the Legislature clearly fails to convey to the tenant the degree of impunity with which Mississippi eviction statutes permit the landlord to act in this context. In the court's view, the combined effect of Mississippi's exempt property and eviction statutes renders them tantamount to a legal trap which almost seems designed to allow landlords to seize, without consequences, the property of their defaulting tenants.

Given the widespread knowledge that a debtor can exempt much of her personal property from creditors under Mississippi law, this court believes that it would have been constitutionally

17

required for the Legislature to adopt notice provisions which clearly and conspicuously warn that these statutory rights would effectively be forfeited during eviction. As discussed below, this court concludes that even if the Legislature had provided such clear notice of the consequences of overstaying a lease, the eviction statutes would still be arbitrary and capricious as a substantive matter, and thus violative of the Equal Protection Clause. As it stands, however, nothing which can even remotely be regarded as adequate notice of the forfeiture of important statutory rights is provided by Mississippi's eviction statutes, and this court therefore concludes that these statutes violate both the Due Process and Equal Protection clauses of the Fourteenth Amendment.

As a sidenote of sorts, this court observes that, while the constitutional vagueness doctrine applies primarily in criminal cases, it believes that the Supreme Court's conclusion that "[a] statute can be impermissibly vague … if it authorizes or even encourages arbitrary and discriminatory enforcement," *see Hill v. Colorado*, 530 U.S. 703, 732, 120 S. Ct. 2480 (2000), echoes some of the very same due process concerns which motivate this court's opinion today. In so stating, this court emphasizes that, under the void-for-vagueness doctrine, laws that fix the permissible sentences for criminal offenses must specify the range of available sentences with "sufficient clarity." *United States v. Batchelder*, 442 U.S. 114, 123, 99 S. Ct. 2198 (1979). This court further notes that, while plaintiff did not suffer criminal liability as a result of her eviction in this case, she did, most certainly, suffer a loss of property of great value to her under circumstances which amounted to a punishment for her failure to timely vacate her apartment.[5]

---

[5] And, it is worth noting that the application of arbitrary laws only adds to the burdens on the poor, which may itself encourage criminal behavior.

18

Under these circumstances, this court believes that, if due process requires that statutes inform criminal defendants of the applicable sentencing ranges with sufficient clarity, which it does, then there is no good reason why it would not likewise require the State of Mississippi to clearly inform tenants of the fact that, in the event of eviction, their most cherished personal possessions left on the premises will effectively become the property of their landlord, with no legal right on their part to secure its return. In the court's view, the vague reference in Mississippi's eviction statutes to landlords "dispos[ing] of" their property in the event of eviction fail to convey this reality with sufficient clarity, and this language "authorizes or even encourages arbitrary . . . enforcement," within the meaning of *Hill*. Thus, while this court has written its order today in the context of insufficient notice, and not vagueness, it believes that, conceptually speaking, the same considerations of due process and fairness which undergird the U.S. Supreme Court's vagueness jurisprudence apply with great force in this case.[6]

In the court's view, the sheer improbability and outrageousness of the procedures devised by the Mississippi Legislature in the eviction context placed an even greater burden on the State, before authorizing the deprivation of its citizens' property, to let tenants know exactly what fate awaits them if they failed to timely remove their property. In the court's view, a statute which leaves a tenant to engage in a guessing game of sorts regarding the effects of her failing to comply with an eviction notice can hardly be said to have provided constitutionally sufficient

---

[6] This court notes that it is only the criminal law origins of the void-for-vagueness doctrine which dissuaded it from including it as a formal basis for finding Mississippi's eviction statutes unconstitutional. This court believes that, this civil/criminal distinction aside, the principles underlying the vagueness doctrine apply with great clarity in this case, and it can discern no good reason why these principles should not apply here. At the same time, this court recognizes that the Supreme Court has held that "[t]o find a civil statute void for vagueness, the statute must be so vague and indefinite as really to be no rule or standard at all." *Boutilier v. INS*, 387 U.S. 118, 123, 87 S. Ct. 1563 (1967). This court acknowledges that this presents a difficult standard to meet, and it has therefore chosen to write its order in terms of notice, rather than vagueness.

notice.  This court therefore concludes that §§ 89-7-31, 89-7-35 and 89-7-41 fail to provide constitutionally adequate notice to Mississippi tenants regarding the implications of their failing to timely vacate the leased premises, and that they accordingly violate the Fourteenth Amendment's Due Process Clause.

> **Sections 89-7-31, 89-7-35 and 89-7-41 of the Mississippi Code violate the Fourteen Amendment's Equal Protection Clause by making an arbitrary and capricious distinction between defaulting tenants and other defaulting debtors, specifically with regard to the designation of property which is exempt from attachment by creditors.**

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."[7]  While the Equal Protection Clause is most commonly thought of as protecting racial and other groups against intentional discrimination, the U.S. Supreme Court has made it clear that its reach is much broader than that.  Indeed, the Supreme Court has held that the Equal Protection Clause is implicated even when a "class" consisting of a single plaintiff is treated in an arbitrary and capricious manner by a state or local government, and even if the plaintiff's interests which are violated involved purely economic or property rights.

A decision which illustrates this point well is the Supreme Court's 2000 decision in *Village of Willowbrook v. Olech*, 528 U.S. 562, 563–64, 120 S. Ct. 1073, 1074 (2000).  In *Olech*,

---

[7]This court notes that, while plaintiff does not assert her arguments in the context of the Equal Protection Clause, the *amicus* briefing of the Mississippi Center for Justice does so, and it is well established that this is the correct legal context in which to analyze issues of unconstitutional arbitrariness.  *See, e.g. Engquist v. Oregon Dep't of Agr.,* 553 U.S. 591, 598, 128 S. Ct. 2146, 2151 (2008)(noting that the "Equal Protection Clause [serves] as a shield against arbitrary classifications.")

Grace Olech and her husband asked the Village of Willowbrook to connect their property to the municipal water supply. *Olech*, 528 U.S. at 563. The Village at first conditioned the connection on the Olechs granting the Village a 33–foot easement. *Id.* The Olechs objected, claiming that the Village only required a 15–foot easement from other property owners seeking access to the water supply and that, by requiring them to grant a 33-foot easement, the municipality was denying them the equal protection of the law. The district court dismissed the lawsuit for failure to state a cognizable claim under the Equal Protection Clause, but the Seventh Circuit reversed, holding that a plaintiff can allege an equal protection violation by asserting that state action was motivated solely by a "spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." 160 F.3d 386, 387 (1998) (*quoting Esmail v. Macrane,* 53 F.3d 176, 180 (C.A.7 1995)).

The Supreme Court affirmed the Seventh Circuit's reversal in *Olech*, but, in doing so, it made it clear that the Equal Protection Clause's scope was even broader than the circuit court had believed. Specifically, the Supreme Court wrote that:

> Olech's complaint can fairly be construed as alleging that the Village intentionally demanded a 33–foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15–foot easement from other similarly situated property owners. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint also alleged that the Village's demand was "irrational and wholly arbitrary" and that the Village ultimately connected her property after receiving a clearly adequate 15–foot easement. These allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis. We therefore affirm the judgment of the Court of Appeals, but do not reach the alternative theory of "subjective ill will" relied on by that court.

*Olech*, 528 U.S. at 565. *Olech* thus makes it clear that the Equal Protection Clause's protections are implicated when a "class" of even a single plaintiff is treated in an arbitrary and capricious manner by the government, thus denying him the equal protection of the laws. In a later decision, the Supreme Court reaffirmed its analysis in *Olech*, citing it for the proposition that

"when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a rational basis for the difference in treatment." *Engquist*, 553 U.S. at 602.

With this precedent in mind, this court concludes that §§ 89-7-31, 89-7-35 and 89-7-41 deny Mississippi tenants the equal protection of the laws, in the event they overstay a lease, by leaving them utterly unprotected against the attachment and seizure of their property by the landlord. This court further concludes that, in so doing, the State makes an arbitrary and capricious distinction between defaulting tenants and other forms of defaulting debtors, who, once again, are provided with extensive protection from the attachment or execution of the very same types of property which the plaintiff saw forfeited in this case. In its briefing in this case, the AG cites nothing about defaulting tenants, as compared to other defaulting debtors, which would justify them being treated in such a manner, and this court can discern no rational basis for the Legislature to have singled out tenants for such harsh treatment.

This court does acknowledge that, since a tenant's property is physically located in the landlord's apartment, this provides a rational basis for the Legislature to have permitted a landlord to *remove* such property from his premises during eviction. As discussed previously, however, Casteel stated in his interrogatory responses that he went much further than that. Specifically, Casteel stated that he sold much of plaintiff's property to satisfy her debt to him, asserting that:

> On March 1, 2019, the PlayStation was sold for $100.00 to a tenant, whose name was Paul, the last name I do not recall. On March 4, 2019 electronic equipment, consisting of a small television, was sold for $40.00 to someone, I do not remember whom. On March 8, 2019, certain kitchen items were sold for $50.00. Again, I do not recall to whom. On March 8, 2019, two (2) lady's gold rings were sold for $80.00 to Possum Town Pawn Shop in East Columbus. On April 11, 2019, a washer and dryer was sold for $50.00. However, I do not recall to whom.

22

Exhibit D (Casteel Discovery Responses, Response 3).

It is clear that Casteel's actions in selling plaintiff's property and keeping the proceeds for himself represented, for all intents and purposes, an execution upon her debt to him, even though many of the traditional due process steps leading up to an execution had not taken place. It is further apparent that, if plaintiff had been some other type of defaulting debtor, then she could have used Mississippi's exempt property laws to prevent Casteel from selling all of the property which he ultimately sold in this case. Unfortunately for plaintiff, she fell in the category of defaulting tenant, and the Mississippi Legislature has, without any rational basis which this court can discern, left this particular category of debtors utterly and completely at the mercy of their creditors. Once again, the AG offers no basis for the State to have singled out tenant debtors for such uniquely harsh treatment, and this court can discern no such basis.

It strikes this court that, if one were to classify defaulting debtors by degrees of egregiousness, then tenants who default on their rent obligations would likely fall in the lesser end of the reprehensibility scale. Indeed, this court submits that most tenants regard their rent payments as being among the debts upon which they would *least* like to default, given the dire consequences associated with being evicted from one's home. That being the case, this court certainly suspects that the vast majority of tenants do their level best to meet their rent obligations, and, in any event, it can discern absolutely no rational reason for them to have been singled out by the Legislature for the extraordinarily harsh treatment meted out by Mississippi's eviction statutes. This court further concludes that, just as the plaintiffs in *Olech* were denied equal protection of the laws by being forced to give their village a larger easement than other citizens, Mississippi tenants are being denied the equal protection of the law by irrationally being prevented from claiming the same exemptions from execution or sale claimed by other debtors.

In so stating, this court emphasizes once again that, in writing these words, it is referring to the landlord's *sale* of a plaintiff's property after eviction, and the retention of the proceeds thereof, rather than simply the *removal* of the plaintiff's property from the premises. This court recognizes that landlords have a right to clear the premises in order to lease it to someone else, but, after that has been accomplished, the outstanding debt owed by the tenant to the landlord strikes it as being no different than any other civil debt, as to which Mississippi's exempt property statutes should apply. This court therefore holds that, in singling out defaulting tenants as such a disadvantaged class of debtors who are unable to claim the personal property exemptions afforded to other debtors by § 85-3-1, the Legislature made an arbitrary and capricious classification which violates the Equal Protection Clause of the Fourteenth Amendment.

**Sections 89-7-31, 89-7-35 and 89-7-41 of the Mississippi Code violate the Fourteen Amendment's Equal Protection Clause by arbitrarily and capriciously authorizing landlords to carry out seizures of tenants' property which can only be based on factors such as personal animosity and vindictiveness, rather than any legitimate economic interests.**

This court now turns to the third manner in which Mississippi's eviction statutes demonstrate arbitrary and capricious lawmaking, namely by authorizing landlords to carry out certain property seizures which can only be based on such factors as personal animosity and vindictiveness. While this finding is closely related to this court's previous Equal Protection findings, it differs from them in an important respect. In the previous section of this order, this court found that the Legislature had no rational basis for singling out defaulting tenants as uniquely disadvantaged debtors who are unable to claim the personal property exemptions set

24

forth in § 85-3-1. The previous section of this order thus relates to the State's action in making a *classification* which lacks any rational basis. Making such an arbitrary classification is unconstitutional, even if some of the rights (such as the right to exempt certain specific property from execution) in question are not otherwise constitutionally-required.

In this section, by contrast, this court finds that the Legislature acted arbitrarily and capriciously by authorizing the "disposal" of certain personal property of the debtor, such as personal keepsakes and family photos, under circumstances which evidence an improper legislative motive. In the court's view, to authorize a landlord to simply discard this sort of personal property, even after it has been removed from his premises, and even after the tenant has demanded its return, represents an outrageous act of vindictiveness which furthers no rational legislative purpose, and therefore evidences arbitrary and capricious lawmaking under the Fourteenth Amendment Equal Protection Clause.

As discussed in the previous section, the Seventh Circuit in *Olech* upheld the Equal Protection claim asserted by a single plaintiff who had suffered only economic injuries at the hands of a municipality. In so doing, the Seventh Circuit held that a plaintiff may properly allege an equal protection violation by asserting that the state action was motivated solely by a "spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." *Id.* Once again, the Supreme Court affirmed the Seventh Circuit's reversal in *Olech*, but it did so on grounds that the municipal action in question was alleged to be arbitrary and capricious, rather than the result of subjective vindictiveness. To reiterate, the Supreme Court in *Olech* held that:

> Olech's complaint can fairly be construed as alleging that the Village intentionally demanded a 33–foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15–foot easement from other similarly situated property owners. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint also alleged that the Village's demand was "irrational and wholly arbitrary" and that the Village ultimately connected her property after

25

receiving a clearly adequate 15–foot easement. These allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis. We therefore affirm the judgment of the Court of Appeals, but do not reach the alternative theory of "subjective ill will" relied on by that court.

*Olech*, 528 U.S. at 565.

While the U.S. Supreme Court thus declined to address the Seventh Circuit's finding of "subjective ill will" in *Olech*, other Supreme Court precedent confirms the Seventh Circuit's view that legislation which can only be based on personal animus against a class of individuals (or even a single individual) is, almost inherently, arbitrary and capricious. In *Romer v. Evans*, 517 U.S. 620, 116 S. Ct. 1620 (1996), for example, the Supreme Court overturned a Colorado constitutional amendment that removed from the local political process an issue primarily affecting gay and lesbian citizens. The amendment, enacted in response to a number of local ordinances prohibiting discrimination against gay citizens, repealed these ordinances and effectively prohibited the adoption of similar ordinances in the future without another amendment to the State Constitution. *Romer*, 517 U.S., at 623–624. In finding that the legislation in question violated the Equal Protection Clause, the Supreme Court concluded that it was "born of animosity toward the class of persons affected" and that such simple animosity had no rational relation to any legitimate governmental purpose. *Id.* at 634.

Similarly, in *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S. Ct. 3249 (1985), the U. S. Supreme Court overturned a local ordinance as applied to the denial of a special permit for operating a group home for the "mentally retarded."[8] In so doing, the Supreme Court found unconvincing the reasons offered for the denial of the permit, such as protecting the inhabitants against the risk of flooding, given that nursing or convalescent homes were allowed

---

[8] This is the terminology used in the Supreme Court's opinion.

without a permit. *Id.* at 448. After rejecting the offered justifications, the Supreme Court concluded that "[t]he short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded," *id.* at 450, and it found such an irrational prejudice to not even withstand rational basis scrutiny.

*Romer* and *Cleburn* thus provide a strong indication that state action which is based on simple animus or vindictiveness against a certain group cannot withstand even rational basis scrutiny. In so stating, this court notes that neither the class of homosexuals at issue in *Romer* nor the class of the mentally disabled at issue in *Cleburn* enjoyed the heightened protections offered to "suspect classes," and that, in each case, the Supreme Court appeared to base its ruling upon a finding that, once any potentially valid reasons offered for the state action were rejected, the Court's own perceptions regarding the defendants' motivations could be accepted as the actual ones.

This court notes that, in this case, there appears to have been little doubt in Casteel's mind regarding the Legislature's intent in empowering him to "dispose of" plaintiff's property in the manner he saw fit. As quoted previously, plaintiff testified that Casteel told her, when she tried to remove her property during the eviction, that "[y]ou don't understand. This is all mine and you can't take anything. These are all of my belongings. This is my stuff." [Conner Deposition, p. 45, ln. 3 – 10]. It seems clear that Casteel received ample confirmation of his views during the eviction, such as when he witnessed plaintiff call the Justice Court and obtain confirmation that any interest she might have in her most cherished belongings was now completely at Casteel's mercy. Constable Sanders likewise made it clear to plaintiff that she was not entitled to take any of her possessions with her, apart from a small number of clothes and

medication, which, once again, he appeared to allow her to take out of mercy, rather than any legal obligation of which this court is aware.

Casteel thus had every reason to believe that the State of Mississippi "had his back" when he chose to simply throw away plaintiff's cherished personal possessions, such as "keepsakes from when her son was a baby, her personal records and items, and family photographs," rather than return them to her. [Plaintiff's brief at 9]. And, indeed, the AG, does tacitly defend his actions in its briefing, noting that the relevant statutes "do not provide specific guidance to landlords regarding what they should do to 'dispose of' a tenant's property not removed before the warrant." [AG's brief at 15]. In light of the foregoing, it is abundantly clear to this court that, in enacting the eviction statutes at issue in this case, the State of Mississippi made it plain to landlords that they could act with legal impunity during the eviction process, in giving free expression to any personal hostilities they may have developed against the defaulting tenant. Under these circumstances, this court concludes that the State of Mississippi may not legally distance itself from the acts of vindictiveness and animosity which it enabled and encouraged through the enactment of these statutes, regardless of its own subjective motivations.

As to the issue of the Legislature's motivations, this court is, frankly, at a loss to understand the reasons which led it to enact the eviction statutes in question. While it does not seem fanciful to wonder whether some members of the Legislature who supported this legislation might have been landlords themselves who had developed negative views towards tenants who overstay their leases, that would be pure speculation. This court does note, however, that it has repeatedly urged the Legislature to amend the statutes in question in order "to provide clearer and more reasonable procedures for evictions." [Summary judgment order at

28

7].  These repeated urgings, which began even prior to the last legislative session, have not resulted in any legislative action of which this court is aware.

While the Legislature's continued silence on this issue heightens this court's suspicions regarding its motivations, it believes it to be unnecessary to make any formal findings on this issue in this case.  In so stating, this court notes that, while the Legislature's specific motivations escape its understanding, the eviction statutes which it passed clearly empower numerous landlords such as Casteel to give free vent to their hostility towards their defaulting tenants during eviction. In the court's view, the Legislature clearly knew that many landlords harbor considerable animosity towards their tenants who fail to pay their rent, and it is thus significant that it saw fit to empower them to "dispose of" defaulting tenants' property in any manner they saw fit, "without further notice or obligation" to the tenant.

This court concludes that, by issuing what amounts to a blank check of state-sanctioned arbitrariness to landlords, the Legislature itself essentially adopted and endorsed the acts of vindictiveness which, it must surely have known, would follow.  Indeed, this court notes that, in its October 2020 order, it specifically quoted the allegations of the Complaint in this case in openly asking the Legislature whether the current eviction statutes were the "the best this state can offer in this context."  [Slip op. at 6].  Judging by the legislative silence to this court's question, it can only assume that the Legislature believes that the answer to this question is "yes."  For its part, however, this court not only concludes that the State of Mississippi *can* do better than the current eviction statutes, it concludes that the statutes in question violate the Fourteenth Amendment, and that, therefore, the Legislature *must* do better.

Legislators of past generations not only had some charitable inclinations towards the poor and misfortunate, but realized that the state benefitted when farmers could hang on to their

implements and workmen their tools, and lawyers their books, and the crippled their crutches, for otherwise they become dependents and wards. Surely today's solons can find their way to similar insight and wisdom.[9]   Moreover, this court finds, consistent with *Romer* and *Cleburn*, that encouraging and enabling the sort of vindictive actions committed by landlords such as Casteel serves no rational legislative purpose and that it constitutes arbitrary and capricious lawmaking, under the Equal Protection Clause. This court therefore concludes that §§ 89-7-31, 89-7-35 and 89-7-41 are unconstitutional for this additional reason.[10]


### Motions for Summary Judgment


This court's order today is primarily concerned with addressing constitutional issues, but it notes that it also has before it motions for summary judgment filed by the individual defendants in this case. In addressing these motions, this court initially notes that its primary purpose today is to vindicate the provisions of the U.S. Constitution and to encourage a fairer and more equitable eviction process for Mississippians going forward.   In so doing, however, this court admits to considerable hesitance to make any ruling which would suddenly create damages actions against thousands of landlords throughout the State of Mississippi who were

---

[9] See § 85-3-1, exempting, inter alia, "[h]ousehold goods, wearing apparel, books, animals or crops; implements, professional books or tools of the trade; [p]rofessionally prescribed health aids."

[10] As a final point on the constitutional issues, this court notes that in her brief, plaintiff argues that the State's actions in this case constitute an unlawful seizure under the Fourth Amendment or an unlawful taking under the Fifth Amendment. [Brief at 14-19]. While this court believes that plaintiffs' arguments have, conceptually-speaking, some merit, it is given pause by the fact that her arguments either lack authority or cite authority which arose in criminal contexts far removed from the present eviction context. *See United States v. Nordling*, 804 F.2d 1466 (9th Cir. 1986); *Abel v. United States*, 362 U.S. 217, 80 S. Ct. 683, 4 L. Ed. 2d 668 (1960). Thus, while this court does not reject plaintiff's arguments outright (and the Fifth Circuit may consider them if it wishes to do so), it declines to find Mississippi's eviction statutes unconstitutional based upon her cited authority, at this time.

simply enforcing the eviction laws which the Legislature gave them. Indeed, this court notes that what is arguably the most outrageous action taken by Casteel in this case, namely throwing away plaintiff's cherished family photos and childhood keepsakes, was arguably the action most clearly authorized by the eviction statutes' directive for landlords to "dispose of" the overstaying tenant's property, with no restrictions provided and "without further notice or obligation to the tenant." *Id.*

While basic human decency would require that Casteel return plaintiff's most cherished possessions to her, Mississippi eviction statutes do not do so, and this court believes that, in the vast majority of evictions which have been carried out statewide, valid Justice Court Judgments of Possession would provide landlords with some form of immunity from liability in this context. In so stating, this court notes that, while private defendants have been held unable to assert the same qualified immunity defense which is available to state officers, the U.S. Supreme Court has held open the possibility that they may be able to assert a more limited "good faith defense." *See Richardson v. McKnight*, 521 U.S. 399, 413, 117 S. Ct. 2100, 2108 (1997). Indeed, the Supreme Court has specifically cautioned against leaving private individuals who work alongside government employees "holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Filarsky v. Delia*, 566 U.S. 377, 391, 132 S. Ct. 1657, 1666 (2012).

It thus seems likely that the Supreme Court would recognize some sort of "good faith defense" for private defendants in an appropriate case, and this court tends to think that such a defense would apply to Mississippi landlords who were acting pursuant to a Justice Court Judgment of Possession. In so stating, this court acknowledges that there is precedent holding individual defendants liable for enforcing unconstitutional statutes, but it seems clear that, in the

31

vast majority of evictions statewide, landlords rely not only upon apparently valid statutes themselves, but also Justice Court possession orders. Under these circumstances, holding landlords liable for doing something which a Justice Court specifically authorized them to do, based upon apparently valid Mississippi statutes, would be harsh indeed.

That brings this court to the crucial fact that this case involved, by the AG's own admission, a very considerable procedural error by the Justice Court, in that it failed to issue a Judgement of Possession in this case, as required by § 89-7-41. This Judgment, which would have "put the landlord into possession of the premises," *see* § 89-7-41(1), is not a minor detail of an eviction under Mississippi law, but, rather, the central court order which would have made clear to the lessor defendants in this case that right to possession of the premises now belonged to them. In the court's view, while it could be argued that a good faith defense should apply even in cases where the judge in question erred, the fact that the Justice Court in this case did not issue an Order of Possession *at all* at least arguably opens the door to liability on the part of the lessor defendants in this case. In so stating, this court notes that, as landlords, defendants presumably knew the type of court orders they needed to have in hand before foreclosing on a tenant. This court believes that, in cases where, as here, they completely lacked those court orders, they arguably should have known that they were relying neither upon Mississippi statutes nor a valid Justice Court possession order in carrying out the eviction.

Moreover, unlike Constable Sanders, the lessor defendants in this case are not able to invoke the robust protections of the qualified immunity doctrine, nor are they able to rely upon the Warrant of Removal from the Justice Court which, as discussed below, specifically ordered "the Sheriff or Constable" of Lowndes County to "remove" plaintiff "and [her] goods and chattels" from the apartment. Finally, this court emphasizes that the actions of the lessor

defendants, particularly Casteel, strike it as being far more outrageous than those of Constable Sanders, who, as mentioned previously, did at least show some human compassion for the plaintiff, such as by allowing her to take some clothes and medication with her. Indeed, plaintiff testified that it was Casteel who repeatedly encouraged Sanders to take increasingly harsher actions against her, up to and including arresting her (which Sanders thankfully declined to do).

While this court believes that it would be a slippery slope to assign degrees of outrageousness to landlords who were enforcing a statutory framework which is itself outrageous, it does seem appropriate to consider it as an *additional* factor in cases where, as here, the framework was not even followed in the first place and the landlord is thus not able to wrap himself in its provisions. Thus, while the lessor defendants at least have an argument that, *if* they had carried out a lawful eviction under the Mississippi statutory framework, then that framework would have allowed them to "dispose of" plaintiff's property as they saw fit, this court believes that there are, at the very least, fact issues regarding whether they carried out a lawful eviction at all and whether they had the legal right to remove plaintiff from her apartment in the first place. In light of the foregoing, this court is not prepared to grant the lessor defendants' motions for summary judgment, and, given the nature of their actions in this case, it is not at all troubled by the fact that they will be forced to bear the burden and expense of trial.

This court does recognize, however, that the lessor defendants raise serious arguments that, even without an Order of Possession, they believed that they were acting in accordance with Mississippi law in this case. This court acknowledges, for example, that the fact that Casteel witnessed plaintiff call the Justice Court and obtain confirmation that he was entitled to seize her property gives him a legitimate argument that he should be able to assert some sort of good faith defense. This court is simply undecided on this issue at this time, and it concludes that it should

first observe the evidence at trial, and consider any renewed briefing from the parties, prior to making a final ruling on this issue at the directed verdict stage of trial. This court will likewise make a ruling at that time on the lessor defendants' arguments that they were not acting under color of state law in this case, thus precluding § 1983 liability.

This court believes that plaintiff and the landlord defendants each face significant obstacles to prevailing in this matter, and, now that the constitutional issues have been ruled upon, it believes that they would be well advised to consider settling this case. In the court's view, any such settlement would appropriately reflect the legal uncertainties surrounding plaintiff's claim, and also, from defendant's perspective, the fact that a jury would likely not look kindly upon its actions in this case. In any event, this court is not prepared to dismiss the lessor defendants from this case prior to trial, and their motion for summary judgment will therefore be denied.

A different result is in order as to the summary judgment motion filed by Constable Casteel, primarily due to the fact that, as a state officer, he enjoys the robust protection of the qualified immunity doctrine. In considering this defense, this court applies the Fifth Circuit's qualified immunity standard, which it has described as follows:

> This court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." If the evidence viewed in the light most favorable to Appellees demonstrates that a constitutional violation occurred, "we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.

*Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007).

Part of the power of the qualified immunity doctrine arises from the fact that it must simply be raised as a defense by a defendant, and the plaintiff has the burden of establishing the

proof and arguments necessary to overcome it. *See Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir.1997) (noting that the plaintiff bears the burden of demonstrating that an individual defendant is not entitled to qualified immunity). Once again, plaintiff's burden in this regard includes an obligation to demonstrate that the defendants violated "clearly established law" at the time of the conduct in question. The U.S. Supreme Court has made it clear just how heavy a burden this may be.

In *Plumhoff v. Rickard*, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014), the Supreme Court emphasized that:

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was " 'clearly established' " at the time of the challenged conduct. *Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id.,* at 2083–2084. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." Ibid. In addition, "[w]e have repeatedly told courts ... not to define clearly established law at a high level of generality," *id.,* at 2074, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

*Plumhoff*, 134 S.Ct. at 2023. Thus, the U.S. Supreme Court has stressed that plaintiffs' burden of demonstrating that defendants violated "clearly established law" requires not a citation to generalized principles of law, but, rather, specific authority on point which "placed the statutory or constitutional question" confronted by the official "beyond debate." *Id.*

In responding to Sanders' qualified immunity motion, plaintiff relies, somewhat paradoxically, upon a single Fifth Circuit decision which actually *affirmed* the district court's grant of an officer's qualified immunity motion. *See Foust v. McNeill*, 310 F. 3d 849, 861 (5th Cir. 2002). In arguing that *Foust* put Sanders on notice of the illegality of his actions, plaintiff writes in her brief that:

Samantha has, in any event, pointed the court to a fundamentally similar case. Like in this case, in *Foust v. McNeill*, county law enforcement officers went beyond the command of a civil writ, seized all of the Fousts' personal property by changing the locks, and then transferred their property to a private party. *Id.* In this factually similar case, the 5th Circuit Court of Appeals held that this seizure violated the due process clause. The Court also found that the official's seizure of property beyond the command of the writ violated the 4th amendment. Foust, at 858, 859. The 5th Circuit also noted that the United States Supreme Court has long held that individuals have strong property interest in their personal possessions. *Id*, at 858 (internal citations omitted).

Despite the clear violations of the Fousts' constitutional rights, the 5th Circuit ultimately affirmed the district court's grant of qualified immunity to the law enforcement officers in their individual capacities because, unlike Constable Sanders in this case, the officers in Foust were acting pursuant to a vaguely worded judicial order and were reasonably attempting to follow its command. *Id.* at 859. Unlike the officials in Foust, Constable Sanders was not reasonably obeying the command of a vaguely worded writ. The plain language of the Warrant in this case is not vague. The Warrant did not command Sanders to seize Samantha's belongings or hand them over to her landlord. Sanders himself admits this.

[Plaintiffs' brief at 23-24].

This court believes that, in relying upon *Foust*, plaintiff both overstates the similarity of that case to this one and understates the factors which led the Fifth Circuit to find that the officers' qualified immunity defense should be sustained in that case. With regard to the first point, this court notes that *Foust* did not involve evictions at all, but rather replevins which are addressed by entirely different statutory framework. Moreover, *Foust* did not rely upon an isolated error by a state court judge in enforcing a statutory framework which had, at the time, not been found unconstitutional. *Foust* therefore does not address the dilemma faced by Sanders in this case, namely how to proceed in enforcing a well-established framework for eviction in a case where the state court erred in issuing the appropriate order to transfer possession of the premises. Indeed, it should be emphasized that the AG, in her briefing, places the blame squarely on the Justice Court in this regard, and it strikes this court as understandable that Sanders might have harbored confusion about how to proceed under these circumstances.

36

In the court's view, the most important factor supporting Sanders' qualified immunity motion lies in the fact that, although he lacked a Judgment of Possession from the Justice Court, he did have a Warrant of Removal from that court which specifically ordered "the Sheriff or Constable" of Lowndes County to "remove" plaintiff "and the goods and chattels" therein from the apartment.  [Docket entry 119-8].  This court emphasizes that this was an outright *order* from the Justice Court to Sanders as Constable, and, under these circumstances, it is entirely understandable that he would have interpreted it as leaving him little choice but to evict plaintiff and to seize her property.

In addressing the Warrant of Removal, plaintiff argues in her brief that:

As can easily be seen the plain language of the Warrant of Removal in this case did not command Constable Sanders to seize Samantha's belongings and hand them over to her landlord.  Rather it ordered Constable Sanders to remove Samantha from the premises, put her landlord in possession, and seize property to cover his costs in executing the warrant and return proof of his execution to the Justice Court.

[Brief at 6].  In the court's view, plaintiff's detailed (and arguably hair-splitting) analysis of the language of the Warrant of Removal might well be appropriate in a legal context which was far less deferential to the actions of the officer than the qualified immunity context is.  As it stands, plaintiff's argument fails to recognize that the issue in the qualified immunity context is simply whether the officer "reasonably could have believed that his actions were lawful," *see Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034 (1987), and not whether they were, strictly speaking, carried out in a legally flawless manner.

In this case, Sanders had a court order in hand which commanded him to evict plaintiff and to seize property which belonged to her.  Moreover, Sanders' interpretation of this order was no doubt influenced by the facts that 1) he routinely carried out evictions pursuant to Mississippi statutes which, he was clearly aware, gave evicting landlords the ability to seize the property of

their tenants left on the premises during eviction; 2) neither these statutes, nor any other similar statutes, had been held unconstitutional at the time of his actions; and 3) the plaintiff in this case actually called the Justice Court during the eviction and obtained confirmation from the court that the seizure of her property was legal under Mississippi law. Under these circumstances, this court concludes that, as in *Foust*, Sanders had a "reasonable basis for his belief that [his conduct] was constitutional," *see Foust*, 310 F.3d at 861, and his qualified immunity motion will therefore be sustained.

This court concludes that, with regard to the official capacity claim against Sanders, which is properly regarded as a claim against Lowndes County itself, plaintiff is unable to surmount the steep obstacles to municipal liability established by the U.S. Supreme Court's decision in *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018 (1978). Under *Monell* and its progeny, a municipality may only be held liable under § 1983 for violating a citizen's constitutional rights if "the governmental body itself 'subjects' [that] person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1359 (2011). Governmental entities are "responsible only for [their] own illegal acts" and are "not vicariously liable under § 1983 for [their] employees' actions." *Id.* Thus, there is no *respondeat superior* liability under § 1983; rather, the key to municipal liability is demonstrating that a deprivation of a constitutional right was inflicted pursuant to an official policy or custom of the municipality in question. *Monell,* 436 U.S. at 694.

To establish constitutional liability under *Monell*, a plaintiff must demonstrate (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.

38

*Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247-249 (5th Cir. 2003). A "policy or custom" can be either (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. *McGregory v. City of Jackson*, 335 Fed. App'x 446, 448-449 (5th Cir. 2009).

With this authority in mind, this court turns to plaintiff's arguments for municipal liability, namely that:

> Like in *Foust*, here neither Lowndes County nor Constable Sanders has a formal policy statement, ordinance, regulation, or decision governing the way in which Sanders executes warrants of removal in his jurisdiction. Sanders and the County are indifferent to Sanders' normal practice of seizing tenants' belongings pursuant to a warrant of removal that does not command him to do so. Sanders does this despite his participation in State mandated training regarding the applicable laws and the appropriate methods of executing process. According to Sanders, the Constables in Lowndes County work independently of each other, each setting their own policies and methods of execution. Constable Sanders testified that there was nothing atypical about his actions during Samantha's removal. His practice is so common and well settled as to constitute Sanders' custom as Constable that fairly represents Lowndes County policy.

[Brief at 11-12].

Plaintiff's reliance upon *Foust* in this context is not well taken, since that case involved actions taken by the Pearl River Sheriff's Department, and it is well established that "[s]heriffs in Mississippi are final policymakers with respect to all law enforcement decisions made within their counties." *Brooks v. George Cty., Miss.,* 84 F.3d 157, 165 (5th Cir. 1996). In this case, by contrast, plaintiff herself notes that "the constables in Lowndes County work independently of each other, each setting their own policies and methods of execution." In the court's view, this provides a very poor argument that these constables should be regarded as final policymakers for

the County, since it makes no sense to assert that a municipality could simultaneously have multiple, often contradictory, policies relating to the manner in which evictions are carried out.

In addition, while Sanders does, in fact, routinely carry out evictions in Lowndes County, the unique fact of this case is that the Justice Court improperly failed to enter a Judgment of Possession prior to eviction. Thus, Sanders' actions in dealing with the specific and unique situation which arose in this case cannot be regarded as "so common and well settled as to constitute [his] custom as Constable that fairly represents Lowndes County policy," and his motion to dismiss the official capacity claims against him will therefore be granted.

In light of the foregoing, it is hereby ordered that §§ 89-7-31, 89-7-35 and 89-7-41 of the Mississippi Code are declared unconstitutional, although, as noted below, this finding will be stayed pending interlocutory appeal. Plaintiff's motion for summary judgment [113-1] is granted to the extent that it seeks a finding that the above statutes are unconstitutional, but it is otherwise denied. The motions for summary judgment filed by the lessor defendants Casteel, Brooks and Alltin, LLC [117-1, 119-1] are denied, and the motion for summary judgment filed by Constable Sanders [105-1, 107-1] is granted. Plaintiff's motion for preliminary injunction [144-1] is dismissed as moot. The pending motions for leave to file amicus briefs [121-1, 137-1] are granted, and the motion to file a sur-rebuttal brief [138-1] is likewise granted.

Furthermore, it is the opinion of the court that its order finding Mississippi's eviction statutes unconstitutional involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. This court therefore certifies the question of the constitutionality of §§ 89-7-31, 89-7-35 and 89-7-41 as the sole issue for interlocutory appeal

under 28 U.S.C. § 1292(b).[11]  It is further ordered that this case is STAYED pending either the issuance of a decision by the Fifth Circuit resolving the interlocutory appeal or the denial of the application for interlocutory appeal.  It is further order that this court's order finding §§ 89-7-31, 89-7-35 and 89-7-41 of the Mississippi Code unconstitutional is stayed pending interlocutory appeal.[12]

So ordered, this, the 30th day of November, 2021.

/s/ Michael P. Mills
U.S. DISTRICT COURT

---

[11] This statute provides that "[t]he Court of Appeals . . . may . . .permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order."

[12] A district court's decision to grant or deny a stay pending appeal rests in the discretion of that court. However, the court must exercise that discretion in light of the four factors for a stay pending appeal.  *In re First South Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir. 1987).  These factors are: (1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest.  *Id.*

With regard to the first factor, this court would not have made its ruling today if it did not believe it to be correct, and it is therefore unable to state that it believes that defendants' interlocutory appeal will likely be successful.  This court does believe, however, that *if* its ruling is held to have been incorrect then defendants would, in fact, have suffered irreparable harm from Mississippi's eviction statutes having been incorrectly declared unconstitutional.  Furthermore, this court does not believe that plaintiff would be substantially harmed by the stay, since it seems unlikely that she will fall victim to the deficiencies in Mississippi's eviction statutes during the pendency of the appeal.  By far the most compelling factor supporting a stay, however, is the fourth, relating to the public interest.  In the court's view, there would likely be serious disruptions to the housing market in this state if Mississippi's eviction statutes were declared unconstitutional without the Legislature having been given a full opportunity to pass revised statutes.  This court therefore concludes that the balance of the four factors supports a stay in this case.